

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| **LAKEITHA CLAYTON** | **CIVIL ACTION NO. 04-1401-A** |
| -vs- | **JUDGE DRELL** |
| **CITY OF BUNKIE, et al.** | **MAGISTRATE JUDGE KIRK** |

## REASONS FOR JUDGMENT

Plaintiff, Lakeitha Clayton, filed this suit seeking compensation for damages she allegedly sustained as a result of what she contends was an unlawful arrest and an excessive use of force at the hands of Reggie Sanders, a police officer with the City of Bunkie.[1] Following stipulations by the parties, as well as rulings on pretrial motions and on a defense motion under Fed. R. Civ. P. 52(c), the only matters remaining for decision involve the excessive force and deprivation of due process rights claims against Reggie Sanders, the Louisiana state law tort claims against Reggie Sanders, and the Louisiana state law vicarious liability claims against the City of Bunkie. The matter has been tried before this Court, and all appropriate post-trial submissions have been made. Considering the evidence and argument of counsel, and for the reasons set forth below, this Court will render judgment in favor of Plaintiff, Lakeitha Clayton, and against

---

[1] Although Officer Sanders was also a defendant in <u>Doucet v. City of Bunkie</u>, bearing Docket Number 04-1231, another excessive force case tried by this Court, we do not find any evidence of a pattern or practice of conduct on Mr. Sanders's part. We have analyzed the instant case completely independently of the facts and circumstances present in <u>Doucet</u>.

Defendants, Reggie Sanders and the City of Bunkie, in the amount of $2,000.00 plus legal interest and costs as provided by law.

## I. ISSUES AND FINDINGS OF FACT

### A. The Assertions of the Parties

Other than the date and location of the event at issue (July 11, 2003 on West Church Street in Bunkie, Louisiana), the parties agree on almost nothing else.

According to Plaintiff, Lakeitha Clayton,[2] she and Fredrick Dixon were walking toward Mrs. Clayton's home after dark.[3] When they were on West Church Street, Curtis Leary stopped his vehicle in a parking area parallel to the street to speak with them. Mrs. Clayton moved to the driver's side of the car to talk to Mr. Leary, but she was not in the roadway. Officer Reggie Sanders then pulled his patrol car behind Mr. Leary's vehicle and asked if they needed any assistance. At that point, Mrs. Clayton returned to the sidewalk and continued walking. When she reached the driveway area between two buildings, she was approximately one block from her home, and she started to cross the street. When she was either in the driveway or in an area of the street between the travel lane and the sidewalk, Mr. Sanders instructed her to return to the sidewalk. After she failed to do so, he sprayed the chemical agent "Freeze Plus P"[4] in her face, handcuffed her, placed her in his patrol car, and transported her to the police station,

---

[2] The Bunkie Police Department Offense Report lists "Laketeria Clayton" as the suspect. (Exhibit J-1.) There is apparently no dispute that Plaintiff, Lakeitha Clayton, is the correct party.

[3] The police report shows the incident occurred at 1:00 A.M. (Exhibit J-1.)

[4] Plaintiff's expert, Dr. Lloyd Grafton, testified that "Freeze Plus P" is one of the strongest chemicals used outside of the military. Officer Sanders disagreed and said more potent chemical agents are available for non-military purposes.

2

where she was charged with obstruction of a public passage and resisting arrest. Mrs. Clayton testified Mr. Sanders did not tell her she was under arrest and did not instruct her to put her hands behind her back before he deployed the chemical agent. Additionally, Mrs. Clayton stated that when Mr. Sanders asked for her name, she gave it to him, and she told him her name when they were in the car travelling to the station. She also said Nadia Robinson, another police department employee with whom Plaintiff was acquainted, was present at the police station.

Mrs. Clayton further alleges that once they reached the station, Mr. Sanders physically forced her to sit in a chair and did not give her anything with which she could clean her face. She was then placed in a cell and told she would remain there overnight. When Plaintiff's husband, Tracy Clayton, arrived at the police station, he told Mr. Sanders he wanted to post Plaintiff's bond. However, he was not allowed to do so. Despite the lateness of the hour, Mr. Clayton walked to the home of Albert Kelly, a member of the City Council, who then accompanied Mr. Clayton back to the police station. When they arrived, another City Council member, Mr. Lemuel Bassette, was also present. At some point, Bunkie's Mayor, Gerard Moreau, came to the police station. Plaintiff claims Mayor Moreau had a private conversation with Mr. Sanders, after which Ms. Clayton was given a summons to appear in court and was allowed to leave without posting any bond. When Plaintiff subsequently appeared in court, she was informed the matter had been "continued." To Mrs. Clayton's knowledge, the court date was never rescheduled. This was the first time in her life Mrs. Clayton had ever had any trouble involving the police.

3

When Mrs. Clayton got home that evening, she was unable to sleep, because her face and eyes were burning, she was having trouble seeing, her nose was running, and she was not able to catch her breath. The next day, when she was still feeling the effects of the chemical spray, Mrs. Clayton sought, but was unable to obtain, medical treatment. A few days later, she had a medical appointment for an unrelated condition. At that time, she mentioned she had been sprayed with a chemical agent, but she was not given any treatment. She estimated that the effects of the chemical spray persisted for approximately three weeks.

Defendant, Officer Sanders, testified the vehicle he pulled behind was stopped on West Church Street partially in the travel lane and partially in the parking area. Two women and a man were standing next to the car, on the driver's side, in the travel lane of the roadway. When he ascertained the vehicle was not disabled, he instructed the driver to move on, and the vehicle pulled away. Mrs. Clayton then began walking in the middle of the travel lane and refused to move to the sidewalk despite multiple requests to do so. Mr. Sanders advised Mrs. Clayton she was under arrest for obstruction of a public passage. He told her to turn around and place her hands behind her back, but she would not comply. Mr. Sanders reached for Plaintiff's wrist, but she pulled away on more than one occasion and hid her hands where he could not see them.[5] Mr. Sanders, who was certified by the State of Louisiana Peace Officer Standards & Training Council ("POST") and who had completed basic certification for the PPCT Defensive Tactics

---

[5] Other than the VHS tape Mrs. Clayton was holding, Mr. Sanders said he had no reason to believe Mrs. Clayton had a weapon.

System,[6] said he felt this activity on Plaintiff's part constituted defensive resistance. Eventually, in order to gain compliance, Mr. Sanders utilized a one second burst of Freeze Plus P to Plaintiff's face.[7] He was then able to handcuff Mrs. Clayton and transport her to the police station. Once there, Plaintiff refused to sit down, so Mr. Sanders placed his hand on her shoulder and sat her in a chair. He repeatedly asked Plaintiff for her identification, but she would not provide it. She was, therefore, listed as "Jane Doe" and was told she would need to reveal her name before she could be released on bond. Later, after she spoke with Mayor Moreau, Plaintiff gave Mr. Sanders her personal information and was allowed to leave. Defendants claim Mrs. Clayton did not request medical assistance at any time, and that she was given items she could use to remove the chemical agent from her face.

## B. Additional Testimony

Detective Roland Patterson of the Avoyelles Parish Sheriff's Office testified he was approached by Bunkie Police Chief Mary Fanara while he was investigating another matter involving Mr. Sanders and was asked to look into the July 11, 2003 incident. In the course of the investigation, Mr. Patterson interviewed Albert Kelly, one of the Bunkie City Council members who had come to the police station at the request of Mr. Clayton. Mr. Kelly had spoken to Mr. Sanders in an attempt to secure Mrs. Clayton's release, but the effort was unsuccessful. Mr. Patterson also interviewed Plaintiff, Tracy Clayton, Fred Dixon, Lemuel Bassette, Nadia Robinson, and Mr. Sanders. After he completed his

---

[6] *See* Exhibit D-3.

[7] Mr. Sanders said he did not use a hard empty hand technique, because he felt that would have caused Plaintiff more damage than the chemical spray would.

investigation, Mr. Patterson forwarded the information to the District Attorney's office for Grand Jury consideration, but he did not form any opinions or conclusions about the incident. Mr. Patterson later testified before the Grand Jury, which declined to indict Mr. Sanders.

Police Chief Mary Fanara explained during her testimony that she had previously received one complaint of excessive force on the part of Reggie Sanders. In Mrs. Clayton's case, Ms. Fanara was not given an official complaint. Rather, she became aware there might be a problem regarding the incident when it was discussed at a City Council meeting. Ms. Fanara also said she does not keep any type of specific records regarding when her officers deploy a chemical agent such as Freeze Plus P, but that the chemical is not used often.

Although Ms. Fanara was out of town on July 11, 2003, Mr. Sanders subsequently called her and told her he had utilized his chemical agent to subdue Mrs. Clayton. Interpreting the situation as he described it (that Mrs. Clayton was pulling away from Mr. Sanders and was refusing to let him handcuff her), Ms. Fanara felt his use of the chemical spray was appropriate.

Ms. Fanara also learned that, according to Mr. Sanders, Mrs. Clayton had been walking in the roadway, she was not just crossing the street. Under those circumstances, Ms. Fanara felt it was procedurally correct for Mr. Sanders to charge Mrs. Clayton with obstruction of a public passage. She further testified that there had been, and are, problems in Bunkie with people congregating in and obstructing streets. In response to hypothetical questions from Plaintiff's counsel, Ms. Fanara testified she did

not think it would be appropriate to arrest someone for obstructing a public passage if the person were simply on the shoulder of the road or walking in the roadway only long enough to cross the street.

Based upon the information available to her, Ms. Fanara decided not to reprimand or otherwise punish Mr. Sanders in connection with the July 11, 2003 incident. It was her opinion Mr. Sanders had used no more force than was necessary under the circumstances to execute the arrest. Also, based upon the details[8] Ms. Fanara received that Mrs. Clayton was held until she divulged her identity, the Police Chief found no need to investigate that aspect of the matter any further. Ms. Fanara additionally explained that, although she had invited Mr. and Mrs. Clayton to come to her office and discuss the July 11th incident, they did not do so. Similarly, neither Mr. Kelly nor Mr. Bassette registered a complaint with Ms. Fanara regarding Mrs. Clayton's arrest and subsequent detention.

Tracy Clayton, Plaintiff's husband, testified he was at home asleep when his wife was arrested. He was notified of the situation by Fred Dixon. Mr. Clayton then travelled to the police station, where he spoke to Mr. Sanders, who told Mr. Clayton his wife was not getting out that night. Mr. Clayton was not able to go back and see his wife at that time, but he could hear her. Indeed, even when he was outside the police station, he had been able to hear her screaming that her face was burning and she wanted some attention. Mr. Clayton then went to Mr. Kelly's house and told him about the situation.

---

[8] Ms. Fanara had also spoken with Nadia Robinson, who was working at the police station on July 11th, and who said she did not think Mr. Sanders had acted inappropriately in his dealings with Mrs. Clayton.

7

Mr. Kelly called Mr. Bassette and subsequently accompanied Mr. Clayton to the police station. Mr. Clayton again requested that Plaintiff be allowed out of jail. Mr. Sanders did not explain why Plaintiff had to remain, but he refused to release her.

Mr. Clayton was given permission to visit his wife, after which he again spoke to Mr. Sanders. At that point, Mr. Clayton was getting angry, so he went outside to calm down. Mayor Moreau then arrived and spoke privately with Mr. Sanders. After that conversation, Ms. Clayton was released. Mr. Clayton did not have to post any bond or pay any fine.

Upon returning home after her release, Mrs. Clayton complained to her husband that her eyes were burning, itching, and stinging. Mrs. Clayton wanted to wash her face, but her husband, who had been sprayed with a chemical agent in the past, advised her against it. Instead, Mr. Clayton gave his wife money for a doctor's visit, but he was unable to accompany her. She later told him that she visited a doctor, but she did not receive any treatment. For approximately two days after the incident, Mrs. Clayton continued to voice major complaints, then, for "like a couple of weeks" she complained about a burning sensation in her face after she would wash it. Mrs. Clayton did not attempt to visit any other doctors, because they did not have the resources or the transportation to pursue additional medical treatment.

Mr. Clayton also explained his wife was not a violent person, and that in the eight years they had been married, she had never been arrested. Additionally, he noted she was not known to carry a gun or a knife, and she did not have any type of martial arts training.

Under cross-examination, Mr. Clayton estimated approximately ninety minutes to two hours elapsed between the time he summoned Mr. Kelly and the time Mrs. Clayton returned home. Mr. Clayton did not try to obtain a ride for his wife to the hospital on the night of the incident.

Lemuel Bassette testified he was present at the police station, but he did not recall hearing Mrs. Clayton screaming that her face was burning or that she needed medical treatment.

Mayor Gerard Moreau explained he was awakened by a phone call from Nadia Robinson[9] and asked to come to the police station on the night of the incident. Once he arrived, he spoke with Officer Sanders, who said he could not release Mrs. Clayton until he got her name. The needed information was then supplied to Officer Sanders, and Mayor Moreau left after approximately five minutes.[10]

Nadia Robinson, a dispatcher for the Bunkie Police Department, testified she was at the police station when Mrs. Clayton arrived. Instead of being seated when asked to do so by Mr. Sanders, Mrs. Clayton refused to sit down and used profanity for an extended period of time. She also refused to provide her name, despite the fact Mr. Sanders asked her for it on more than one occasion.

During his testimony, Fredrick Dixon, Tracy Clayton's brother, said they were still on the sidewalk, not in the street or in the parking area, when Mr. Sanders approached

---

[9] Ms. Robinson denied contacting the Mayor.

[10] The undersigned notes it is at least peripherally significant that as soon as the Mayor arrived, the matter was easily resolved. This points to the continuing poor judgment exercised by Officer Sanders on that night, and it adds legitimacy to Plaintiff's version of the facts.

9

them. Mr. Dixon also stated that Mr. Sanders did not say anything to Plaintiff before he sprayed her with the chemical agent.[11] Mr. Dixon, who saw Mr. Sanders handcuff Plaintiff,[12] felt Mr. Sanders was not handling Plaintiff in the right way when he was placing her in the car. Mr. Dixon also said he did not see Plaintiff resist Mr. Sanders in any way before she was handcuffed. After the incident occurred, Mr. Dixon walked to his brother's house and informed him of the situation. Mr. Dixon then went home and had no other involvement in the case. He did wonder, however, why he was not arrested when Mrs. Clayton was, because he was walking in the same area.

The testimony presented is hopelessly in conflict.

## C. The Experts

Dr. Lloyd Grafton, an associate professor of criminal justice at a Louisiana university, was accepted by the Court as an expert in the use of force and general police procedures. He explained he was retained by Plaintiff and reviewed the offense report, copies of interviews from several individuals involved in the incident, copies of Reggie Sanders's training certificates, and the "Defensive Tactics Student Manual" issued by PPCT Management Systems, Inc.[13]

---

[11] These statements differ from the testimony Mr. Dixon gave at his deposition. At that time, he said they were on the shoulder area of the roadway when the officer approached, Mr. Sanders had spoken to them, and Mr. Sanders and Mrs. Clayton were arguing at the scene.

[12] This also varies from Mr. Dixon's deposition testimony that he did not see the officer handcuff Plaintiff.

[13] *See* Exhibit P-7.

Dr. Grafton testified that officers are taught to utilize a continuum of force, and he specifically explained the "Resistance Control Continuum" found in the PPCT Manual.[14] Officer Sanders said he was familiar with this continuum, which explains the general levels of control an officer should exert in response to degrees of resistance asserted by a subject.[15]

Based on his review of the records, Dr. Grafton opined Mr. Sanders should have effected the arrest on Mrs. Clayton by using a soft empty hand control technique, such as a wrist lock, rather than deploying his chemical weapon. In rendering this opinion, Dr. Grafton emphasized that Mrs. Clayton was physically smaller than Mr. Sanders, and she was not exhibiting any physically aggressive behavior. If Mr. Sanders had found such soft empty hand controls to be ineffective, he should have progressed only one level up the continuum of force, to hard empty hand techniques, rather than jumping two levels to the use of the chemical agent.[16] Dr. Grafton also testified he felt it violated

---

[14] Exhibit P-7, p. 3-10. This continuum of force and the one utilized by the Louisiana District Attorney's Handbook were the force charts used during Officer Sanders's training.

[15] According to the continuum, the levels of resistance and the coordinating levels of control to be analyzed in this case would fall somewhere in the following range: (a) passive resistance (such as failure to react to verbal commands), to which soft empty hand control techniques (such as joint locks, pressure points, or light knee strikes that have little or no potential for injury) would be appropriate; (b) defensive resistance (such as pulling/pushing away or resistance to handcuffing), to which hard empty hand control techniques (such as a palm heel strike to the torso or a knee strike to the thigh that have the potential to cause bruises, contusions, or lacerations) would be appropriate; and (c) active aggression (such as advancing, punching, kicking, grabbing, etc.), to which the use of intermediate weapons (such as a baton or chemical weapon) would be appropriate.

[16] Specifically, PPCT the manual explains, in pertinent part:

PPCT encourages officers to think of the PPCT Resistance/Control Continuum as a reactionary continuum. In other words, the Resistance/Control Continuum teaches officers to respond to a specific level of resistance with a specific level of control. For example, if an officer faces an armed subject who is about to shoot the officer, the officer does not have to escalate to deadly force by first using empty hand control or the use of

11

proper police procedures for Mr. Sanders to continue to hold Mrs. Clayton as a "Jane Doe" after her identity had been given by others.

Defendants called Dr. Larry Gould of Northern Arizona University, who was accepted by the Court as an expert in the area of police policies and procedures, including arrest and the use of force. Dr. Gould explained that following a review of several depositions and pleadings related to the July 11th incident, in his opinion, under the circumstances as he understood them, the arrest was proper, and Mr. Sanders followed all necessary protocol and procedure. As to the force continuum, Dr. Gould testified that the various responses of the police officer to the actions of the suspect do not have to be performed sequentially. Rather, an officer may proceed directly to the type of force needed to handle the situation he encounters. Therefore, when faced with defensive resistance, as Mr. Sanders was, he was not required to use hard empty hand techniques before he deployed his chemical weapon. Rather, he simply needed to employ the reasonable choice on the continuum in order to effectuate the arrest efficiently. Dr. Gould also explained that the use of force continuum utilized by the Louisiana District Attorney's Association suggests the use of a chemical weapon before the use of hard empty hand techniques.

---

intermediate weapons. The officer simply escalates to deadly force accordingly. The use of nonlethal force is no different.

In any officer/subject contact there is the potential for injury to the officer and/or subject. As the subject's resistance or aggressive actions increase, the potential for injury to the officer increases. When the officer escalates control methods to gain control of the subject, the potential for injury to the subject increases.

Exhibit P-7, pp. 3-10 - 3-13.

Under cross examination, Dr. Gould admitted that if one were to accept Mrs. Clayton's testimony regarding the events of that evening, she was arrested without reason and the arrest was effectuated outside the guidelines of generally accepted police policies and procedures.

## II. APPLICABLE LAW

Plaintiff's federal claims are brought pursuant to 42 U.S.C. 1983, which allows claimants to seek redress against any person who, under color of state law, deprives her of a constitutionally guaranteed right. In this case, the evidence is clear Mr. Sanders was acting under color of state law, as an officer of the Bunkie Police Department.

**A. The Arrest**

According to the Offense Report[17] and the testimony of Officer Sanders, Mrs. Clayton was initially arrested under La. R.S. 14:100.1, which establishes a misdemeanor offense and provides, in pertinent part:

> No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, . . . road, or other passageway . . . by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

A police officer has "probable cause" to arrest when the facts and circumstances within his personal knowledge "are sufficient to occasion a person of reasonable prudence to believe an offense has been committed." Bigford v. Taylor, 834 F.2d 1213, 1218 (5th Cir. 1988). In this case, Plaintiff has shown, by a preponderance of the evidence, that she was not in the roadway at the time she was arrested. At worst, she

---

[17] Exhibit J-1.

13

was moving from a driveway into the shoulder portion of the street as she began an attempt to cross the road. This attempt, however, was thwarted by Officer Sanders's actions. It was after midnight in Bunkie, Louisiana, hardly a booming metropolis. There is no evidence of any traffic in the area throughout the time of the incident, other than Officer Sanders's vehicle. Likewise, there is no indication Officer Sanders was unable to traverse the roadway because of Mrs. Clayton's behavior. See State of Louisiana v. Malveaux, 852 So.2d 463 (La. App. 3d Cir. 2003).[18]

The offense report also shows Mrs. Clayton was charged with resisting arrest. Louisiana law is clear that a person has a right to resist an unlawful arrest. White v. Morris, 345 So.2d 461 (La. 1977). Therefore, neither documented charge against Mrs. Clayton was appropriate.

Plaintiff also asserts a state law claim for false arrest. Under Louisiana law,

> [T]he tort of false arrest or imprisonment consists of two elements: (1) detention of an individual and (2) unlawfulness of that detention. False arrest and imprisonment occur when one arrests and restrains another person against his will without a warrant or other statutory authority.

Cooks v. Rodenbeck, 711 So.2d 444, 447 (La. App. 3d Cir. 1998) (internal citations omitted). For the reasons set forth above, the Court finds these elements have been satisfied.

---

[18] Defendants argue Plaintiff's arrest was appropriate, because she was violating either the statute that requires a person to walk on the sidewalk if one is provided along a state highway, La. R.S. 32:216, or the statute that prohibits crossing at a location other than a crosswalk, La. R.S. 32:213(B). However, the preponderance of the evidence shows neither of those statutes had been violated either. Mrs. Clayton was either on the sidewalk or on an extension of the sidewalk, and she had not yet entered the roadway in her attempt to cross the street. There is also no evidence of the existence of painted crosswalks at the intersection in this rural city.

14

## B. The Force

As the Fifth Circuit has explained:

"[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness standard.' As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force claim is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . .

* * *

It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege '(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need[,] and the excessiveness of which was (3) objectively unreasonable.' In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that force.

* * *

[W]e believe that the amount of injury required to prevail in an excessive force action depends on the context in which the injury occurs. Nonetheless, this circuit currently requires a plaintiff to have 'suffered at least some injury.' As the Supreme Court has recognized, however, 'the extent of injury suffered by a [plaintiff] is one factor that may suggest whether the use of force' was excessive 'in a particular situation.' Therefore, the amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.[19]

In the instant case, Officer Sanders chose to utilize a chemical weapon in an attempt to subdue a woman who was merely trying to go home and was, at most, lawfully resisting an improper arrest. Regardless of which continuum of force we apply

---

[19] Ikerd v. Blair, 101 F.3d 430, 433-435 (5th Cir. 1996) (internal citations omitted). See also Freeman v. Gore, 483 F.3d 404 (5th Cir. 2007).

15

to the situation, Officer Sanders's methods were beyond the bounds of acceptable police procedures. Applying the standard outlined in the jurisprudence cited above to the facts as established by the totality of the evidence, the undersigned finds that Officer Sanders's use of a chemical weapon on Ms. Clayton constituted an unreasonable and excessive use of force.[20]

The Court further finds that Officer Sanders's conduct caused injury to Plaintiff, which, though not documented in any medical records, was substantiated by Tracy Clayton, Plaintiff's husband. In addition to the inappropriate detention, Mrs. Clayton sustained burning and irritation to her eyes and face that lasted at least several hours. Although minor, these conditions did result directly from the excessive use of force associated with the unlawful arrest and are injuries sufficient to support the Plaintiff's claims of a constitutional violation.

Under Louisiana law, the excessive use of force in effectuating an arrest "transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages."[21] In Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977), the Louisiana Supreme Court set forth certain factors a court

---

[20] Defendants argue they are entitled to qualified immunity. Although it is unclear whether such claim remains procedurally viable at this point in the litigation, it is not necessary for us to rule on that issue. Even if the defense were available, it is inapplicable. A two-part test is used to determine whether a § 1983 defendant is entitled to qualified immunity: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident. See Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1988). Mrs. Clayton was walking home late at night. She committed no crime, and her behavior was not suspect in any way. Officer Sanders's actions were objectively unreasonable.

[21] Patton v. Self, 952 So.2d 874, 878 (La. App. 3d Cir. 2007), quoting Penn v. St. Tammany Parish Sheriff's Office, 843 So.2d 1157, 1161 (La. App. 1st Cir. 2003).

should consider when determining if the force used by an arresting officer was reasonable under the circumstances. These factors include:

> (1) the known character of the arrestee; (2) the risks and dangers faced by the officer; (3) the nature of the offense or behavior involved; (4) the chance of escape if the particular means are not employed; (5) the existence of alternative methods of arrest or subduing the arrestee; (6) the physical size, strength and weaponry of the officers as compared to that of the arrestee; and (7) the exigencies of the moment.[22]

Applying these factors to the evidence presented at trial, as analyzed above, the undersigned finds Officer Sanders's use of "Freeze Plus P" *in these circumstances* was unreasonable and excessive under Louisiana law.

The law is clear that a governmental agency or municipality, such as the City of Bunkie, may only be held liable for an unconstitutional or illegal policy or custom that contributes to a constitutional tort. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[23] However, under Louisiana law, "Masters and employers are answerable for the damage occasioned by their servants ... in the exercise of the functions in which they are employed."[24] In this case, the City of Bunkie, as Mr. Sanders's employer, is legally responsible for his tortious behavior.

---

[22] Patton v. Self, 952 So.2d at 878.

[23] Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978) (emphasis in original).

[24] La. C. C. art. 2320.

Although the Court has not located, and counsel has not provided, recent jurisprudence outlining an appropriate range of general damage awards for injuries such as those sustained by Ms. Clayton, the Court finds $2,000.00 to be reasonable.

### III. CONCLUSION

For the foregoing reasons, this Court RENDERS JUDGMENT AS FOLLOWS: IN FAVOR OF PLAINTIFF, Lakeitha Clayton, and against Defendants, Reggie Sanders and the City of Bunkie, in the amount of $2,000.00 plus legal interest and costs as provided by law. Any claims that may remain will be DISMISSED with prejudice.

SIGNED on this 30th day of March, 2009 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE